UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SELDALE MOON,
    *Plaintiff*,

v.

BLACKMAN *et al.*,
    *Defendants*.

No. 3:18-cv-01542 (JAM)

**ORDER GRANTING UNOPPOSED MOTION FOR SUMMARY JUDGMENT**

Plaintiff Seldale Moon was a pretrial detainee in the custody of the Connecticut Department of Correction ("DOC"). He filed this lawsuit *pro se* under 42 U.S.C. § 1983, alleging that defendants were deliberately indifferent to his unsafe conditions of confinement. Defendants have filed an unopposed motion for summary judgment. I will grant the motion.

**BACKGROUND**

The following facts are undisputed unless otherwise noted. At all times relevant to this litigation, Moon was a pretrial detainee. Doc. #50-2 at (¶ 2). He names four defendants in his amended complaint: Sidney Blackmon, Central Transportation Unit ("CTU") Officer; Gervacio Negron, CTU Officer; Daniel Papoosha, Administrative Intelligence Lieutenant at Bridgeport Correctional Center ("BCC"); and Chad Milling, Correction Officer at BCC. Doc. #39.[1]

In April 2016, Moon was placed on protective custody ("PC") status. *Id.* at 2 (¶ 1). In August 2017, he was transferred to BCC. *Id.* (¶ 2). From April 2016 to August 2017, Moon was only ever transported to court in solitary transports. *Id.* (¶ 3). He alleges that in late August or early September 2017, defendant Papoosha, his unit manager, assured him that his transports

---

[1] Moon's amended complaint does not state defendants' first names and misspells defendant Blackmon's last name. The Court uses the complete names and correct spellings as set forth in defendants' motion papers.

1

would remain solitary. *Id.* at 2-3 (¶ 5). But Papoosha does not recall that conversation and avers that he would not have said that because he had no control over inmate transport nor believed solitary transport was required for PC inmates. Doc. #50-3 at 3 (¶¶ 8-11). Rather, the method of transporting a particular inmate is generally determined by the CTU in conjunction with other DOC units, Doc. #50-2 at 2 (¶¶ 9-10), and there was no formal bar against the transport of PC inmates with general population inmates, *id.* at 2 (¶ 12), 6 (¶¶ 48-49); *see also* Administrative Directive 9.9, § 11 ("Protective Custody inmates shall be kept separate from General Population inmates and activities *or* directly monitored by staff so as to minimize the risk to the Protective Custody inmate.") (emphasis added). Regardless, Papoosha had no prior knowledge of or involvement in Moon's transportation on September 20, 2017. Doc. #50-2 at 2 (¶¶ 8, 11, 13-15).

Before 7:00am on September 20, 2017, defendant Milling was dispatched to escort Moon to admitting and processing ("A&P") in preparation for his transportation to court. *Id.* (¶¶ 16-17). Moon alleges that Milling disclosed that he would be transported with general population inmates, that this upset Moon such that he asked for Milling's superior and mental health staff, and that Milling refused both requests. Doc. #39 at 3-4 (¶¶ 10-13). But Milling avers that Moon simply asked whether he would be transported with anyone and that Milling responded that he did not know, that Moon asked for mental health staff and did not respond to Milling's offer to call the medical unit because mental health staff had not yet arrived to work, and that Moon asked to speak with a lieutenant and that Milling offered to call one when one became available. Doc. #50-4 at 3 (¶¶ 7, 9-11). Moon did not state why he wanted to speak with Milling's superior or with mental health staff. Doc. #50-2 at 3 (¶¶ 21, 24). After this exchange, Milling left the room to perform his other escort duties and attempted to contact a lieutenant for Moon. *Id.* at 4

2

(¶¶ 26-27). Milling had no further knowledge of or involvement in Moon's transportation that day. *Id.* (¶¶ 29-31).

Defendants Blackmon and Negron were assigned to transport three inmates to court in a van that day: Moon; another inmate from BCC; and Norman Renaldi from Garner Correctional Institution. *Id.* at 4-5 (¶¶ 32, 39, 41). The back of the van had three rows for inmate seating, and this inmate enclosure was separated from the front of the van by a metal screen. *Id.* (¶¶ 34-36). Before picking up the three inmates, Blackmon had received information about each of them that would have included any problematic history between the inmates, but there was no such history between Moon and the other two inmates. *Id.* at 5 (¶¶ 37-38). Prior to this transport, Renaldi did not know Moon, *id.* at 9 (¶ 70), and Moon did not know the other two inmates, Doc. #50-9 at 14.

Blackmon and Negron first picked up Renaldi, placed him in black box restraints, then secured the van before entering A&P at BCC to pick up Moon and the other inmate. Doc. #50-2 at 5 (¶¶ 39-42). Blackmon asked Moon to confirm his identity. Doc. #50-5 at 3 (¶ 14); Doc. #50-6 at 3 (¶ 12). Moon alleges that while doing so, Blackmon "announced" Moon's PC status in front of general population inmates, Doc. #39 at 4 (¶ 16), but Blackmon avers that Moon initiated discussion of his PC status by using it as grounds to argue he required special transport, Doc. #50-5 at 4 (¶¶ 15, 17, 23). Blackmon informed Moon that Moon was on his travel list and therefore permitted to travel in a CTU van. Doc. #50-2 at 6 (¶ 46). Moon alleges that he asked Blackmon to call his superior and mental health staff, but that Blackmon refused on grounds that there was not enough time, called Moon a "PC Bitch," "snitch," and "faggot," and threatened Moon with disciplinary reports if he did not enter the van. Doc. #39 at 5 (¶¶ 18-19, 21). Blackmon by contrast avers that Moon indicated he would immediately attack another inmate if

3

placed in a van with others. Doc. #50-5 at 5 (¶ 24). Moon ultimately agreed to enter the van. Doc. #50-2 at 6 (¶ 51).

Per CTU policy with respect to the transportation of PC inmates, Moon was placed in the front row of the inmate enclosure. *Id.* at 6-7 (¶¶ 49, 56). Renaldi was placed in the second row behind Moon, and the third inmate was placed in the third row. *Id.* at 7 (¶¶ 53-55). Blackmon, Negron, and Renaldi aver that all inmates were placed in black box restraints and "V"-shaped seatbelts, *id.*; Doc. #50-6 at 4 (¶¶ 20-24); Doc. #50-7 at 2-3 (¶¶ 4, 7-9), but Moon alleges that he was the only inmate placed in a seatbelt, Doc. #39 at 6 (¶ 28).

At some point, Moon pushed backward out of his seatbelt and bit Renaldi on the forehead, but Renaldi did not retaliate. Doc. #50-2 at 8 (¶¶ 60-62). Blackmon and Negron aver that this occurred as soon as Blackmon shut the van door. Doc. #50-5 at 5-6 (¶¶ 32, 36); Doc. #50-6 at 5 (¶¶ 25, 29). Blackmon immediately removed Moon from the van and took him back to A&P for processing. Doc. #39 at 7 (¶ 39); Doc. #50-5 at 6 (¶¶ 33-34). Moon alleges that Milling then escorted him to a cell and refused his request to see mental health and medical staff because he had been spit on, although he concedes he was seen by such staff one hour and twenty minutes later. Doc. #39 at 7-8 (¶¶ 40-42).

Moon pleaded guilty to criminal assault on Renaldi, Doc. #50-2 at 9 (¶ 73), but alleges that it was prompted by the other inmates' comments that he was a "snitch" and "rapist," by Renaldi spitting on him and threatening to physically harm him, and by the lack of any response to his cries for help, Doc. #39 at 6-7 (¶¶ 30-33); Doc. #50-9 at 6-13. Blackmon and Negron deny hearing any comments from the van, hearing Moon complain about any spitting, or seeing any evidence of spitting, Doc. #50-5 at 6 (¶¶ 36-37); Doc. #50-6 at 5 (¶ 29), and Renaldi denies that he spit on Moon or that any comments were made in the van, Doc. #50-7 at 3 (¶¶ 14-15).

On September 12, 2018, Moon filed this lawsuit, Doc. #1, and on October 15, 2019, he filed an amended complaint, Doc. #39. Moon alleges that defendants' conduct constituted deliberate indifference to his safety in violation of the Fourteenth Amendment. *Id.* at 8 (¶ 47).

On June 30, 2020, defendants filed a motion for summary judgment. Doc. #50. Attached to their motion is the required notice to self-represented litigants, certifying that a copy of the motion was served on Moon at Osborn Correctional Institution. Doc. #50-11. Although Moon's most recent notice of change of address states that he is confined at MacDougall-Walker Correctional Institution, Doc. #8, the DOC website states that his current address is in fact Osborn Correctional Institution.[2] Moon has not responded to the motion for summary judgment.

## DISCUSSION

The principles governing the review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

In *Jackson v. Federal Express*, 766 F.3d 189 (2d Cir. 2014), the Second Circuit instructed that "when a party, whether *pro se* or counseled, fails to respond to an opponent's motion for

---

[2] *See* Offender Information Search (Inmate No. 362678), CONN. DEP'T OF CORRECTION, http://www.ctinmateinfo.state.ct.us/ (last visited August 3, 2020).

5

summary judgment, a district court may not enter a default judgment," but "must examine the movant's statement of undisputed facts and the proffered record support and determine whether the movant is entitled to summary judgment." *Id.* at 197. Here, because Moon has filed a verified complaint, I will consider his allegations as akin to an affidavit he submitted in opposition to summary judgment. *See, e.g.*, *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). Still, to the extent that a non-moving party does not file a Local Rule 56 statement to contest any of the moving party's well-supported statements of material fact, I may deem the moving party's facts to be admitted for purposes of the motion. *See* D. Conn. L. Civ. R. 56(a)(1). I will do so here.

In order to establish a claim of a violation of substantive due process regarding conditions of confinement, a pretrial detainee must show either that officials were deliberately indifferent to inhumane conditions or that the conditions are punitive. *See Darnell v. Pineiro*, 849 F.3d 17, 34 n.12 (2d. Cir. 2017). To establish a claim of deliberate indifference to conditions of confinement, a pretrial detainee must show that: (1) a condition posed "an unreasonable risk of serious damage to his health"; and (2) the official "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed" such a risk. *Id.* at 30, 35 (cleaned up). To establish a claim that conditions are punitive, a pretrial detainee must show that a condition was "imposed for the purpose of punishment," either directly with proof of such intent or indirectly by showing that the condition is not reasonably related to a legitimate governmental purpose, such as institutional security. *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 55 (2d Cir. 2017) (cleaned up). "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983,

a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).

Defendants' submissions negate any factual basis for Moon's deliberate indifference claim. No reasonable jury could find that Papoosha and Milling acted intentionally or recklessly toward Moon or that they had personal involvement in the decision to transport Moon alongside general population inmates on September 20, 2017, which is the basis for his claim. Even accepting Moon's allegations as true, Papoosha simply gave him a general assurance that he would be transported only in solitary transports weeks before his transportation on September 20, 2017, and he otherwise lacked any foreknowledge of or involvement in the transportation that day.

Similarly, Milling simply declined to fetch his superior or mental health staff in response to requests by Moon, who did not state any grounds for those requests, and Milling otherwise lacked knowledge of or involvement in Moon's transportation that day. Although Moon alleges that Milling refused to obtain medical care for him following the spitting incident, he concedes that he received such care just over an hour later and there is nothing to suggest that Milling knew or should have known that such a delay posed an excessive risk to Moon's health. *See, e.g.*, *Pateman v. City of White Plains*, 2020 WL 1497054, at *21 (S.D.N.Y. 2020).

As for Blackmon and Negron, there is no fact issue that they lacked any knowledge of a history of conflict between Moon and the other two inmates to be transported on September 20, 2017, that there was in fact no relation between Moon and those inmates, and that the inmates were in black box restraints while in the van. No reasonable jury could find that defendants acted intentionally or recklessly to expose Moon to any risk of harm from the simple fact that defendants knew that he was in protective custody and the other two inmates were in general

population, whether or not defendants failed to fasten the other two inmates' seatbelts. *See, e.g.*, *Smith v. Blair*, 2008 WL 5455406, at *5 (D. Vt. 2008) (finding no deliberate indifference by officials who kept plaintiff in a cell with another inmate who allegedly threatened him where there was, *inter alia*, no history of violence between them). Although deliberate indifference may be shown when an official identifies an inmate as an informant in front of other inmates, *see, e.g.*, *Montanez v. Lee*, 2019 WL 1409451, at *3 (S.D.N.Y. 2019), no reasonable jury could find that Renaldi—left in a secured van—heard those alleged comments by Blackmon in the A&P room, and there is no indication that the third inmate in the van heard those comments either.

There is also the fact that Moon pleaded guilty to criminally assaulting Renaldi. No reasonable jury could find that defendants knew or should have known of a substantial risk of harm to Moon that was of his own making, as evidenced by his guilty plea. *See Clark v. Johnson*, 181 F. App'x 606, 607 (7th Cir. 2006) ("[P]rison officials cannot reasonably be required to protect an inmate who intentionally instigates a violent altercation with another prisoner," at least where the inmate's "violent conduct was not beyond his control"); *see also Louis-Charles v. Courtwright*, 2014 WL 457951, at *6 (N.D.N.Y. 2014) (collecting cases).

Of course, Moon alleges that he was not the instigator. But Moon did not file a Local Rule 56 statement to controvert defendants' Local Rule 56 statement averring that Moon attacked Renaldi, Doc. #50-2 at 8 (¶¶ 60-61), and this alone allows me to credit defendants' version of the facts to the extent that the defendants' version has been properly supported by citations to record evidence. *See S.E.C. v. Glob. Telecom Servs., L.L.C.*, 325 F. Supp. 2d 94, 109 (D. Conn. 2004) (citing *Dusanenko v. Maloney*, 726 F.2d 82, 84 (2d Cir. 1984)).

Moreover, Moon pleaded guilty in Connecticut Superior Court to assaulting Renaldi, *see* Doc. #50-10 at 4, and if I were to rule that Moon acted in self-defense against Renaldi as he

claims, this "would necessarily imply the invalidity of [Moon's] conviction or sentence." *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). As the Supreme Court held in *Heck v. Humphrey*, a section 1983 plaintiff such as Moon cannot "recover damages for . . . harm caused by actions whose unlawfulness would render a conviction or sentence invalid" unless he "prove[s] that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486-87. In the absence of any indication that Moon's conviction for assault has been vacated or overturned, the rule of *Heck v. Humphrey* bars his claim. *See, e.g.*, *Head v. Ebert*, 2019 WL 1316978, at *8 (W.D.N.Y. 2019) ("Plaintiff's contention that he was acting in self-defense cannot be reconciled with his conviction for having assaulted [the officer].").

Even if there is a fact issue going to whether defendants' conduct constituted deliberate indifference to Moon's safety, defendants are entitled to qualified immunity. Qualified immunity shields government officials from claims for money damages unless a plaintiff shows the official has violated clearly established law such that any objectively reasonable official would have understood that his or her conduct amounted to a violation of the plaintiff's constitutional rights. *See Mara v. Rilling*, 921 F.3d 48, 68-69 (2d Cir. 2019).

Clearly, Moon has cited no case from the Second Circuit or Supreme Court that recognizes that PC inmates have a right to private transportation to or from prison facilities, nor has he cited any factually analogous cases where a PC inmate was transported alongside general population inmates who were in restraints and who had no history with the PC inmate. The Court is unaware of any such cases and therefore concludes that any such right was not clearly established as of September 2017. *See also Hundley v. Parker*, 69 F.3d 537 (6th Cir. 1995) (no

clearly established right that inmates once housed in the PC unit and inmates once housed in general population must be housed separately once both were transferred to the segregation unit, "at least in the absence of a documented conflict with one of those prisoners"). Nor does there appear to be any clearly established right for an inmate to be seen by medical staff in under an hour and twenty minutes of being spit on by another inmate. Therefore, even assuming I credited Moon's account of the events at issue, defendants would have qualified immunity from liability.

## CONCLUSION

In accordance with the foregoing, and for substantially the reasons stated in defendants' memorandum of law, the Court GRANTS defendants' unopposed motion for summary judgment. Doc. #50. If Moon intends to make any further filings in this case, then he shall file an updated address of record as required by D. Conn. L. Civ. R. 83.1(c)(2). The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 5th day of August 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge